## UNITED STATES v. WISHKAH BOOM CO.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1905.)

### No. 1,034.

1. NAVIGABLE STREAMS—OBSTRUCTIONS—INJUNCTION—BILL—DEMURRER.

Where a bill to restrain defendant from obstructing a navigable stream alleged that the river was a navigable stream—navigable for small steamboats—and was the only practicable highway for the residents along its upper border to A. and other markets on a certain harbor, and that it was used largely for floating logs and foreign products to market, it was not demurrable for want of equity, in that it failed to allege facts showing an actual use of the river in navigation.

2. SAME—STATUTES.

The provision of Act Cong. Sept. 19, 1890, c. 907, 26 Stat. 454, prohibiting the maintenance of obstructions to navigation in navigable streams, is not inconsistent with Act Cong. March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541], prohibiting the erection of such obstructions.

3. SAME.

Act Cong. Sept. 19, 1890, c. 907, 26 Stat. 454, prohibits the maintenance of obstructions to navigation in navigable streams; and Act March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541], prohibits the construction of such obstructions, and repeals only "all laws or parts of laws inconsistent" therewith, providing that no action begun or right of action accruing prior to the passage of the act shall be affected by such appeal. ·*Held*, that where proofs were admitted without objection that the bill failed to specify the date at which an obstruction in a river was constructed, or during what period it was maintained, under a bill alleging that defendant maintained and continues to maintain an obstruction to navigation in the navigable waters of the river, the bill was maintainable under the act of 1890.

4. SAME—FEDERAL COURTS—JURISDICTION—EVIDENCE.

Where a river within a state was navigable for some distance from its mouth, and was actually navigated by small steamboats and river craft for the purpose of carrying up groceries, supplies, clothing, loggers' tools, etc., to the head of navigation, and returning with farmers' products, a bill was maintainable in the federal courts to restrain a boom company from maintaining a boom in the river in such a manner as to be an obstruction to navigation, though the river was chiefly valuable for floating logs, and there was no proof of actual carriage of goods on the river in interstate commerce.

Appeal from the Circuit Court of the United States for the Northern Division of the District of Washington.

On May 3, 1901, the appellant filed its bill in equity against the appellee to enjoin obstruction to the navigation of the Wishkah river. The bill alleged that the Wishkah river is a navigable stream of the United States, and of the district of Washington, which empties into the Chehalis river and Grays Harbor; that its waters are navigable for small steamboats and other craft from its mouth to a distance of 16 miles or more toward its source; that it is used largely for "floating logs and foreign products to market"; that throughout said navigable portion of said river the tide ebbs and flows; that it is the only practicable highway for the residents along its upper waters to Aberdeen and other markets on Grays Harbor; that the appellee has maintained and continues to maintain an obstruction to navigation in the navigable waters of said river, consisting of a boom located in the bed of said stream for logging purposes, said boom being constructed in such a manner as to block the river, and render navigation therein impossible during low tide, and difficult and impracticable at all times; that the appellee has not obtained permission of the Secretary of War of the United States to construct, continue, or maintain said boom, or any part thereof; and that the same was constructed and is maintained without such permission, and is continued in said navigable waters without the consent of said Secretary of War. The appellee interposed a demurrer to the bill on the ground that it failed to state facts sufficient to constitute a cause of complaint, or to entitle the appellant to any relief against the appellee. The demurrer was overruled; the court holding that it would take judicial notice of the principal geographical features of the country, and of rivers which are in fact highways of commerce, and which appear upon the maps of the country. The appellee answered the bill, admitting that said river is navigable for small boats and other craft, where the tide ebbs and flows therein, and admitting that the said river is used largely for floating logs and timber products to market, and alleging that, of the settlers on said river, only 12 are not engaged in the logging business; that more than 200 men are directly employed in various logging enterprises; that the value of the output of logs from said river above said boom during the year 1900 was nearly $250,000; that the total value of all other products and merchandise whatsoever coming down said river at any time is merely nominal; that the chief use and value of said river, from its source to its mouth, is, and always has been, for the floating of timber and timber products to the mills situate

in the county of Chehalis; and that all the trade and traffic and commerce whatsoever carried on or done on said river is carried on and done by the citizens of the state of Washington, and wholly within said Chehalis County, and consists in carrying supplies of various kinds to the settlers, and is altogether for the support of the logging camps, and men engaged in the logging industry. The answer further alleged that the boom of the appellee is constructed in accordance with the laws of the territory and state of Washington, and that it is so constructed as not to interfere with the navigation of the river; that said Wishkah river is not, and never was, in any part, a navigable water or stream of the United States; that Congress has never exercised legislative control or supervision over said river, or any part thereof; and that the court has no jurisdiction to grant relief in the premises.

Upon these issues testimony was taken, which showed that, beginning with the year 1888, small boats had regularly carried freight and passengers on said river from its mouth to the forks, a distance of about 15 miles; that said boats were small steamboats and gasoline boats of about 50 feet in length, with a draft varying from 2 feet to 3½ feet, that they carried up the river settlers' supplies and loggers' supplies, such as groceries, clothing, shoes, axes, and chains; and that they brought down from settlers on the river products of their farms, such as fruits, potatoes, vegetables, etc. One of the storekeepers of Aberdeen testified that his sales of merchandise to go up the river amounted to from $200 to $350 a month, and that he purchased from the settlers their products which were brought down the river, amounting to from $50 to $100 per month. Another testified that his business with settlers on the river, in goods shipped by boat to and from Aberdeen, was from $3,000 to $5,000 per year. Another testified that he purchases from the settlers products amounting to from $300 to $400 per year, and sells to them goods to the average amount of $200 per month. A witness testified that in 1901 500 tons of freight came down the river on the boats, and that about 1,000 tons were sent up; that the produce which came down went to Aberdeen; and that none of the freight which went up the river was shipped directly from points outside the state, although a considerable proportion thereof was goods imported by merchants at Aberdeen, and by them shipped up the river in original packages. There was testimony that there were from 25 to 30 settlers along the river, aside from those engaged in the logging business, who received goods from Aberdeen by way of the river, and furnished the produce which was sent down. The court, upon the pleadings and the evidence, reached the conclusion that the Wishkah river is chiefly useful for floating saw logs and timber, and is not such a public, navigable river as to have been in contemplation in the enactment of laws by Congress relating to public waters of the United States; that only the smallest class of steam vessels and gasoline boats have ever used it, and that the local traffic by these boats "is insignificant, compared with the use of the stream for floating timber; and that the river has not been used, and in its ordinary condition is not adapted to be used as a highway for the transportation of interstate or foreign commerce," within the authority of Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, and Leovy v. United States, 177 U. S. 621, 20 Sup. Ct. 797, 44 L. Ed. 914. On the authority of the decision last named, the court dismissed the bill.

Jesse A. Frye and Edward E. Cushman, for appellant.

Sidney Moor Heath, Roger S. Greene, and Austin E. Griffiths, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is contended that the demurrer to the bill for want of equity should have been sustained, for the reason that it failed to set forth facts showing an actual use of the river in navigation. The bill alleges that the river is a navigable stream—navigable for small steamboats; that it is

the only practicable highway for the residents along its upper waters to Aberdeen and other markets on Grays Harbor; and that it is used largely for floating logs and foreign products to market. The floating of foreign products to market could only be accomplished in some kind of water craft, and these averments are sufficient, we think, to show that the river was actually used in navigation. In The Daniel Ball, 10 Wall. 557, 563, 19 L. Ed. 999, it was said:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States, within the meaning of the acts of Congress, in contradistinction from the navigable waters of the states, when they form, in their ordinary condition, by themselves, or by uniting with other waters, a continued highway, over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water."

The appellee now contends, further, that there is no equity in the bill, for the reason that it specifies no violation of either the act of September 19, 1890, c. 907, 26 Stat. 454, or the act of March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541]; that it contains no averment that the obstruction to navigation which is complained of was created since the passage of the act of March 3, 1899, which act prohibits the construction of obstructions, and not the maintenance thereof; and that the offense charged is not within the act of 1890 because that act is repealed by section 20 of the act of 1899 (30 Stat. 1154 [U. S. Comp. St. 1901, p. 3547]), and, further, that the cause of suit is not within the saving clause of the repealing section, for the reason that the bill does not allege facts to show that a cause of action had accrued before the passage of the act of 1899. The averment of the bill is "that the appellee has maintained and continues to maintain an obstruction to navigation in the navigable waters of said river." Under this averment the proofs were admitted without the interposition of any objection on the ground that the bill failed to specify the dates at which the booms were constructed, or during what period they were maintained. Section 20 of the act of 1899 repeals only "all laws or parts of laws inconsistent with the foregoing sections," and contains the proviso "that no action begun or right of action accrued prior to the passage of this act shall be affected by this repeal." It is only necessary to quote the repealing clause to show that both the act of 1890 and that of 1899 are operative, as far as the present case is concerned. The provision of the earlier act prohibiting the maintenance of such obstructions is not inconsistent with the later act prohibiting the erection thereof, and, again, it is evident that a right of action had accrued under the first act prior to the date of the repeal.

We think that the decision of the present case on the merits must be ruled by the case of United States v. Bellingham Bay Boom Co., 176 U. S. 211, 20 Sup. Ct. 343, 44 L. Ed. 437. We find it impossible to distinguish it from that case in any essential particular. The Bellingham Bay Boom Company had established a boom which interfered with navigation in the Nooksack river—a small river situate in What-

com county, emptying into Bellingham Bay, and thence into the Pacific Ocean, navigable by light water craft to Lynden, a distance of some 16 miles. In that case, as in this, the logging business was the principal business on the river, and there was the same disparity between its importance and that of the other traffic. In that case, as in this, there was no proof of the actual carriage of goods on the river in interstate commerce. In that case, as in this, groceries, supplies, clothing, and loggers' tools were carried from the mouth of the river to the head of navigation by small steamboats, which on their return trips brought back farmers' produce. In that case, as in this, the logging company attempted to justify its obstruction to navigation under the authority conferred by the act of the Legislature of Washington (1 Hill's Ann. St. & Codes Wash. § 1592), which provided:

"Such corporations shall have power and are hereby authorized in any of the waters of this state, or the dividing waters thereof, to construct, maintain and use all necessary sheer or receiving booms, dolphins, piers, piles, or other structure necessary or convenient for carrying on the business of such corporations: provided, that such boom or booms, sheer booms or receiving booms shall be so constructed as to allow the free passage between any of such booms and the opposite shore for all boats, vessels or steam craft of any kind whatsoever or for ordinary purposes of navigation."

The court in that case affirmed the doctrine that the power of Congress to pass laws for the navigation of public rivers, and to prevent any and all obstructions therein, cannot be questioned, and held that the trial court was bound to decide whether the boom, as existing, was authorized by any law of the state, when such law was relied upon as justification for its creation and continuance. The court said in conclusion:

"There is no doubt that the boom in question in this case violates the statute under which it was built, because it does not allow free passage between the boom and the opposite shore for boats and vessels, as provided for in the state law. For this reason the government was entitled to a decision in its favor."

It is urged against the conclusiveness of that decision as applied to the present case that there is great difference in the size and usefulness of the two rivers, and that the fact that the Nooksack river was navigable, and was used for purposes of interstate commerce, was not questioned, but was taken for granted. It may be true that the Nooksack river is a larger and deeper river than the Wishkah river, but, according to the proofs in the two cases, there is no very considerable difference in the amount of traffic carried on the rivers by boats. We find no warrant for the statement that the navigability of the Nooksack river for purposes of interstate commerce was not questioned, but was taken for granted. The record in that case was before the Supreme Court, and it is not to be supposed that it was disregarded. The testimony as to the extent and nature of the commerce carried on on the Nooksack was not materially different from the testimony on the same subject in the present case. There was no allegation or proof of any interstate commerce of the Nooksack, nor was there proof even of the carriage of goods thereon in original packages, as they were imported from points without the state.

The appellee, as did the court below, relies on the decision in Leovy v. United States, 177 U. S. 621, 20 Sup. Ct. 797, 44 L. Ed. 914. In that case the state of Louisiana, under the authority of the act of Congress of March 2, 1849 (chapter 87, 9 Stat. 352), and other statutes giving it full power to authorize the construction and maintenance of levees, drains, and other structures necessary and suitable to reclaim swamp and overflowed lands within that state, and in the exercise of its police power so conferred, had caused to be constructed a dam across Red Pass Crevasse—a crevasse which had been made by the overflow of water from the Mississippi river. The crevasse had been formed some time before the date of the act. At the time when it was closed by the dam, only the smallest craft attempted to pass through it. There was some evidence, said the court, "that small luggers or yawls, chiefly used by fishermen to carry oysters to and from their beds, sometimes went through this pass; but it was not shown that passengers were ever carried through it, or that freight destined to another state than Louisiana, or, indeed, destined for any market in Louisiana, was ever—much less, habitually—carried through it." The court, after reviewing its prior decisions, said:

"It is a safe inference from these and other cases to the same effect which might be cited that the term 'navigable waters of the United States' has reference to commerce of a substantial and permanent character to be conducted thereon. The power of Congress to regulate such waters is not expressly granted in the Constitution, but is a power incidental to the express power to regulate commerce with foreign nations and among the several states and with the Indian tribes, and with reference to which the observation was made by Chief Justice Marshall that 'it is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states.' Gibbons v. Ogden, 9 Wheat. 1, 194, 6 L. Ed. 23. While, therefore, it may not be easy for a court to define the size and character of a stream which would place it within the category of navigable waters of the United States, or to define what traffic shall constitute commerce among the states, so as to make such questions sheer matters of law, yet, in construing the legislation involved in the case before us, we may be permitted to see that it was not the intention of Congress to interfere with or prevent the exercise by the state of Louisiana of its power to reclaim swamp and overflowed lands by regulating and controlling the current of small streams not used habitually as arteries of interstate commerce."

Referring to the instructions which were given to the jury in the court below, the court said:

"If these instructions were correct, then there is scarcely a creek or stream in the entire country which is not a navigable water of the United States. Nearly all the streams on which a skiff or small lugger can float discharge themselves into other streams or waters flowing into a river which traverses more than one state; and the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another, the jury is informed, is sufficient to constitute a navigable water of the United States. * * * But we do not so understand the legislation of Congress."

The court further said:

"We think the defendant was entitled to the instructions asked for, but refused—that the jury should be satisfied from the evidence that Red Pass was, at the time it was closed as alleged in the indictment, substantially useful to some purpose of interstate commerce."

The construction of the dam was further justified in the opinion of the court on the ground that it was a legitimate exercise of the police power of the state, and it was intimated that the trial court might well have taken judicial notice that the public health is deeply concerned in the reclamation of swamp and overflowed lands. Said the court:

"If there is any fact which may be supposed to be known by everybody, and therefore by courts, it is that swamps and stagnant waters are the cause of malarial and malignant fevers, and that the police power is never more legitimately exercised than in removing such nuisances."

There are expressions in the opinion on which the appellee relies which are said to indicate that the Supreme Court was of the opinion that, in order to justify the interference of the United States to prevent the obstruction of navigable water within a state, it must appear that the commerce on such water extends to or affects other states. But these utterances must all be taken in the light of what was actually decided by the unanimous opinion of the court in the Bellingham Bay Boom Co. Case but a few months before the decision in the Leovy Case. The court, in so quoting in the Leovy Case the language of Chief Justice Marshall in Gibbons v. Ogden, and affirming the power of the state of Louisiana to regulate and control the current of "small streams not used habitually as arteries of interstate commerce," must have had in mind its prior decision, in which it had assumed jurisdiction to interfere with obstructions to navigation of water which, uniting with other waters, formed a continuous highway, over which commerce was or might be carried on with other states or foreign countries, within the definition of the court of "navigable waters of the United States" in the Daniel Ball Case, the language of which was subsequently quoted with approval in the recent case of The Robert W. Parsons, 191 U. S. 17-26, 24 Sup. Ct. 8, 48 L. Ed. 73. It is to be observed that the Leovy Case differs materially from the present case, in the fact that no freight was ever carried to market by the Red Pass Crevasse, and no commerce of any kind was conducted over it. It differs, also, in the fact that the state of Washington has not authorized by its statutes a total obstruction to navigation in the Wishkah river. It has authorized only the construction of booms so placed as to allow free passage between the boom and the opposite shore for boats or vessels, while it has declared that such boom "shall not be construed to be an obstruction to the navigation of a stream if no unreasonable delay is caused thereby." The appellant was entitled, we think, to the judgment of the court upon the question whether the boom was constructed and maintained in compliance with the state law.

The decree is reversed, and the cause is remanded to the court below for further proceedings in accordance with the views herein expressed.