Carmine A. Ventiera, J.
In these consolidated tax proceedings to review the validity of imposition of special franchise tax assessments, respondent City of New York moves for summary judgment dismissing the consolidated petitions. Petitioner cross-moves for summary judgment to annul the special assessments.
Petitioner, a Delaware corporation licensed to do business in New York, had constructed a pipeline from Houston, Texas, to Linden, New Jersey, to convey petroleum. On August 4, 1964 *697 petitioner filed an application with the city for permission to extend its pipeline into the Borough of Richmond at Gulfport and then through the bed of private property and of designated public streets to Port Ivory, where it would exit and proceed through the bed of Arthur Kill to Elizabeth, New Jersey. Though petitioner’s application made specific request only for permission to have its pipeline constructed under the designated public streets, its plans submitted with the application delineated the course of its proposed extension. Petitioner’s application was granted on October 8, 1964 by special resolution of the board of estimate and approved by the Mayor on October 20, 1964.
The resolution made reference to petitioner’s plans, submitted with its application, and granted to petitioner the right "to construct, maintain and operate a pipeline and appurtenant facilities exclusively for the transmission of petroleum products under [the waters of] Arthur Kill from the boundary line between the State of New Jersey and the State of New York to Staten Island * * * where it enters private property known as Gulfport * * * thence across the Borough of Richmond partly through private property * * * and partly through public street and thence under and across Arthur Kill and Port Ivory to the boundary line between the State of New York and the State of New Jersey”. The consent was to "be null and void unless” the petitioner executed an agreement of acceptance as approved by the Corporation Counsel. Petitioner did execute such an agreement of acceptance.
Thereafter petitioner, by direct purchase from the State of New York and by assignments consented to by the State, obtained easements in the bed of the waters of Arthur Kill for the construction of its pipelines delineated in its plans. Examination of those plans discloses that petitioner, if it wished, could have extended its pipeline directly from Linden to Elizabeth or, as an alternate route, through the bed of Arthur Kill on the New Jersey side without entering the New York waters. But petitioner’s preference, as its plans indicate, was for its pipeline to traverse through Staten Island, where there are located the properties of Standard Oil of New Jersey, Esso Standard Oil, Gulf Oil Co., Texas Eastern Transmission Corp. and other nationally known corporations.
After the construction of the oil pipeline through the land and water areas in the defined boundaries of the Borough of Richmond and its use by petitioner, the State Board of Equali *698 zation and Assessment fixed, for the assessment rolls of the city, the following special franchise assessments upon the underwater area portion of petitioner’s pipeline:
Tax Year 1970-71 $1,729,342
Tax Year 1971-72 1,780,588
Tax Year 1972-73 613,608
Tax Year 1973-74 545,803
In prior orders and decisions of this court, all of the petitions for review of the special assessments were consolidated, and prior to a trial being set to establish their validity and proper valuation amounts, the court recommended that the legal issue of "whether the right to maintain and operate these pipelines constitutes a special franchise” should first be determined. The motion and cross motion for summary judgment are limited to that one issue.
Petitioner contends that it never requested of the city the right to construct its pipeline under the waters of Arthur Kill, as it intended to and did acquire that right by easement purchase from the State and from an assignee owner of easement rights granted by the State. The city’s permission to petitioner with respect to Arthur Kill was wholly gratuitous and of no value. Petitioner relies completely on the authorities of Matter of Algonquin Gas Transmission Co. v Moore (2 Misc 2d 997, affd 6 AD2d 333 [1958]) and the cases therein cited to declare the special assessments invalid.
In both the lower and appellate court opinions the courts held that Algonquin had acquired from the State private easement rights in the bed of the Hudson River for the purpose of constructing its gas pipelines as distinguished from a "privilege or a right for the installation of said pipes” (6 AD2d 333, 334, supra). In the first instance, the State, as property owner in the bed of the Hudson River, may sell or grant property rights therein. In the case of a special franchise no property rights are given, only the privilege. In support of this distinction both courts referred to People ex rel. Hudson & Manhattan R. R. Co. v State Bd. of Tax Comrs. (203 NY 119), wherein the petitioner built a tunnel within its easement in the bed of the Hudson for the extension of its railroad to New York. The court there held that the tunnel and operation of the railroad therein was a matter of private right. However, in contradistinction, in all the bridge cases, where the bridge is built on and over privately owned land, the building and maintenance of the bridge were considered to *699 be one of special franchise, the rationale being that the bridge was a potential interference with the public’s right of use of the waters, even if such right be of limited and minor character (see People ex rel. Harlem River and Port Chester R. R. Co. v State Board of Tax Comrs., 215 NY 507; People ex rel. New York Cent. R. R. Co. v State Tax Comm., 239 NY 183; People ex rel. Lehigh Val. Ry. Co. v State Tax Comm., 247 NY 9). As to each of those bridge cases cited in appellant’s brief before the Appellate Division, this court will deem them to have been considered irrelevant by the Appellate Division, but only on the facts and issues there present and the then existent law appertaining thereto.
In the Algonquin case (supra), the petitioner purchased an easement strip in the bed of the Hudson under the waters of the Town of Stony Point in Rockland County and of the Town of Cortlandt in Westchester County to construct its gas transmission pipeline. The petitioner did not seek, nor request, the consent of the towns, nor does it appear from the record that such consent was required. Thus, the fundamental determinant of a special franchise was not presented to the court.
The necessity of the consent of a city to use its public highways is "a step in the grant of a single indivisible franchise * * * It may well be that the city may consent or refuse to consent” (People ex rel. New York Cent. R.R. Co. v State Tax Comm., 264 App Div 80, 90, mod 292 NY 130). "These consents are not mere permits for temporary or extraordinary uses of public property, but they are such a permanent occupation that, under whatever name they may be called, they come within what is intended to be described in the Public Service Law as a franchise” (Matter of Penn-York Natural Gas Corp. v Maltbie, 164 Misc 569, 573; see, also, Madden v Queens County Jockey Club, 296 NY 249, cert den 332 US 761). Though the court there dealt with a railroad crossing city streets, the principle of law is applicable here. Concededly, a pipeline cannot cross city streets without the consent of the city. (See subdivision 6 of section 2 of the Transportation Corporations Law, defining a pipeline corporation as a transportation corporation, and section 89, requiring consent of the local government before a pipeline may be constructed into or through any city in this State and then only "upon terms and compensation agreed upon”.) Moreover, streets for the purposes of franchise are defined under section 361 of the New York City Charter, to include "public grounds *700 or waters within or belonging to the city”. Section 362 of the New York City Charter, in defining the powers of the board of estimate, provides that it "shall have control of the streets of the city * * * [and] grant franchises * * * involving the occupation or use of any of the streets of the city, whether on, under or over the surface thereof, for * * * pipe or other conduits * * * for the transportation of * * * property”. A pipeline may transport or transmit gas, steam, or other "property” such as petroleum.
Petitioner recognized the city’s right to consent to the installation of a pipeline in Staten Island and to grant petitioner a franchise therefor. However, petitioner now complains of the encompassing scope of the franchise accepted by it. Petitioner alleges that it did not require the city’s consent to use the bed of the waters of Arthur Kill as a means to enter the city at Gulfport, since it intended to and did acquire an easement property right to do so. But petitioner does not consider that the city may not have given its consent without specifying the waters of Arthur Kill that are within the boundaries of the Borough of Richmond. It was the province of the city to fix the "terms” of its grant. After petitioner had accepted, without any reservation, the "terms” of the city’s consent before it proceeded to obtain easement rights in the bed of Arthur Kill to construct its pipeline for the conveyance of oil, it may not now urge upon the court that the franchise taxes be assessed and fixed only on that portion of the pipeline as goes through the bed of the local city streets in Staten Island. The city has an obligation to its citizenry to protect and preserve the waters within its boundaries against any potential hazard of pollution and ecological destruction. It can and must include and consider in any grant of consent or franchise for the use of its streets the inherent dangers and effect such use may have on its surrounding waters.
The petitioner, having by agreement accepted the city’s consent without reservation and having used the consent to obtain easement rights in the bed of Arthur Kill, is now bound by its agreement. These facts were not present nor considered in the Algonquin case (2 Misc 2d 997, affd 6 AD2d 333, supra).
Since the Algonquin decision in 1958, world populations and governments have become aware of and concerned over the awesomeness of the potential devastation that water pollution can exact. New world, national and local agencies have been *701 created to protect and preserve the waters from pollution, be it from human waste, trade waste, pesticides, chemicals or oil. New statutes have been enacted and regulations passed to give impetus and strength to the movement to protect our waters. An entirely new codification and enlargement of existing law, designated Environmental Conservation Law, was enacted by our Legislature. A new article was added to the Public Service Law dealing solely with "Liquid Petroleum Pipeline Corporations” (art 3-C). The inherent danger of possible rupture, either from lack of durability or latent defect of materials, or outside causes, of petitioner’s oil pipelines in the waters of Arthur Kill and its deleterious effect on our city, was not presented nor considered in the Algonquin case.
In 1960 (subsequent to the Algonquin decisions) the Legislature enacted section 401 of the Conservation Law as a "Declaration of policy” that it is the sovereign duty of the State to conserve and control its water resources for the benefit of all inhabitants of the State and declared it "to be the public policy of the state of New York that: (1) the regulation and control of the water resources of the state of New York be exercised * * * (7) * * * to require the use of known available and reasonable methods to prevent and control pollution, wastage and unreasonable disturbance and defilement of waters of the state”. Under subdivision (5) of section 403 of the Conservation Law, the definition of "waters” includes those of Arthur Kill. The foregoing sections have been incorporated in article 15 of the new Environmental Conservation Law, and denominated as the "Water Resources Law”. Thus, the ever-present hazard of oil pollution was statutorily made a matter of grave concern and a mandate to protect our waters against any perils. The State’s grant of easement rights to petitioner, and particularly the city’s consent to petitioner, was no longer a matter of common right or without license or approval of the agency of government to construct a pipeline to transport a known pollutant through the waters of the Borough of Richmond.
The rationale of the bridge cases previously referred to now becomes most pertinent in the determination of whether petitioner received a franchise to convey its oil in and through Staten Island, or solely a property right to construct physical facilities for the transportation of petroleum in interstate commerce, as a common carrier. Chief Judge Cardozo, in enunciating the legal concept of franchise in People ex rel. *702 Lehigh Val. Ry. Co. v State Tax Comm. (247 NY 9, supra) stated: "the maintenance of a bridge by a public service corporation across navigable waters, involves the enjoyment of a special franchise subject to taxation, though the bed is in private ownership [pp 11-12] * * * The truth indeed is that a bridge, however placed across a navigable stream, is a potential interference with navigation * * * as to preclude its construction by force of common right or without the license or approval of the appropriate agencies of government [p 12] * * * Interference with navigation can come * * * from obstacles * * * There may be dangers from above. Navigation is impeded if objects falling from a bridge cause damage to the craft below, or expose a traveler to peril. The State has a right to say to what extent such perils, even though slight, shall be permitted [p 13]” (emphasis added).
The State had imposed upon itself by statute an obligation to regulate and franchise the maintenance and operation of pipelines. It was the State’s right to say to what extent "such perils, even though slight, shall be permitted” (Lehigh, supra, p 13). The State board, in declaring and fixing the special franchise assessments for petitioner’s pipelines in the waters of Arthur Kill, did so as a matter of sovereign right to control and protect its waters.
Although it does not appear that either side presented in these motions the issue that the special assessment constituted restraint on interstate commerce, the court believes that such issue is disposed of in Memphis Gas Co. v Stone (335 US 80) and Mid-Valley Pipeline Co. v King (221 Tenn 724, app dsmd 393 US 321).
Accordingly, defendant’s motion for summary judgment is granted only to the extent of determining the right to assess as a special franchise the underwater portions of petitioner’s pipelines. The proper valuation amounts are to be fixed upon a trial on a date to be set between the parties and the court. Petitioner’s cross motion for summary judgment annulling the special franchise assessments is denied.